NEW PROCESS FAT REFINING CORPO-
RATION v. W. C. HARDESTY CO., Inc.
No. 1148.

District Court, D. Delaware.
Nov. 16, 1939.

Russell Wiles and Charles J. Merriam (of Chritton, Wiles, Davies, Hirschl & Dawson), both of Chicago, Ill., and Herbert L. Cohen, of Wilmington, Del., for plaintiff.

W. Brown Morton and S. Howell Brown, Jr. (of Pennie, Davis, Marvin & Edmonds), both of New York City, and E. Ennalls Berl (of Ward & Gray), of Wilmington, Del., for defendant.

NIELDS, District Judge.

This is the usual infringement suit. The complaint charges infringement of patent No. 1,998,997 issued to Lucius M. Tolman, April 23, 1935 for the distillation of fatty acids. The complaint also charges infringement of patent No. 1,951,241 issued to Stanley Goranflo, March 13, 1934 for the distillation and purification of fatty acids.

The defenses are invalidity and non-infringement.

Plaintiff, New Process Fat Refining Corporation, is a corporation of Delaware. This corporation is the owner of both patents. The Goranflo patent although issued earlier is secondary in point of time to the Tolman patent.

Defendant, W. C. Hardesty Company, Inc., is a corporation of Delaware doing business at Dover, Ohio.

The patents in suit relate to the continuous distillation of crude fatty acids in column stills. Column stills such as disclosed in the patents in suit have been used for many years for the continuous distillation of petroleum, alcohol, tar and other materials. The Goranflo patent adds nothing to the disclosure of the Tolman patent save the substitution of a standard bubble column still for the plate column of the Tolman patent.

A distillation process is a process wherein a liquid is boiled and the vapor is collected and condensed. Distillation is widely used as a process of purification. In this suit the impurities are the nonvolatile ingredients. The process of distillation is a separation of volatile and nonvolatile ingredients by boiling away the volatile ingredients and condensing them into a distillate. For a great many years fatty acids have been purified by steam distillation.

Purification of the fatty acid is precisely the same regardless of the type of still in which it is carried out.

Raw fatty acids are derived from garbage, grease, tallow or cottonseed foots. This raw acid is a chemical composition of fatty acids and glycerine. The combination is first split into fatty acids and glycerine. The glycerine is removed by physical means. The resulting fatty acid is composed of palmitic, stearic and oleic acids with dark tarry impurities. The object of distillation is to separate the acids from the impurities. Fatty acids decompose before reaching a distillation temperature. Therefore some method of assisting volatilization such as steam and vacuum is always used. Steam has the same effect as a vacuum in lowering the boiling point. What temperature and pressure should be used is a matter to be worked out practically.

### Tolman patent.

The Tolman patent shows a baffle tower consisting of alternating centrally perforated plates and discs. Claim 1 is typical:

"1. The method of distilling a higher fatty acid from stock containing it which comprises rapidly heating a restricted continuously flowing stream of stock to a temperature of 400° F. to 600° F.; introducing the heated stock into an enlarged distilling zone under subatmospheric pressure; introducing steam into the distilling zone in quantity and at a temperature to produce a temperature of 375° F. to 550° F. at the vapor outlet of the distilling zone, and causing the steam to contact with and travel countercurrent to the heated stock; withdrawing the steam and fatty acid vapors at the vapor outlet of the distilling zone at a temperature of 375 to 550° F. and continuously and separately removing the unvaporized residue from the distilling zone at a temperature above 550° F. and below 750° F. without maintaining a substantial body thereof within said distilling zone."

### Goranflo patent.

The Goranflo patent is similar to that of Tolman. It discloses the use of a bubble tower for the purpose of separation, rather than the baffle tower of Tolman. Claim 5 is typical:

"5. The method of distilling a higher fatty acid from stock containing it, which comprises rapidly heating the stock to a volatilizing temperature, while passing it in

a restricted stream through a heating zone, discharging the stock under subatmospheric pressure into a liquid body of higher fatty-acid-containing stock, successively passing the overflow from said body into other liquid bodies progressively higher in temperature and lower in fatty acid content, simultaneously passing superheated steam through and in intimate and direct contact with said liquid bodies counter current to the flow of the stock whereby the steam in its passage removes practically all of the fatty acid content of the stock, removing entrained matter from the stream of mixed steam and acid vapor at a point, in the direction of travel of the vapor stream, beyond the body to which the stock is fed and removing and condensing the fatty acid vapors."

Claim 11 is much more specific to the operation actually employed by both parties. It is as follows:

"11. The method of claim 5 in which the stock is introduced at a temperature of 470°–520° F., the vapors are removed at 370°–450° F. and the stock remains in the liquid bodies an average of 20–60 minutes."

### History.

Tolman built a conventional baffle column still of laboratory dimensions. His patent speaks of a laboratory column or tower still in the words: "The tower shown in Figs. 2–4 was operated by heating 1.58 gallons of tallow grease per hour at a coil temperature of 600°–630° F. * * *." He used it in the customary way for the steam distillation of fatty acids. Doubtless like all experimenters he tried variations in pressure, temperature and rate of flow of steam and crude acid. Finally he selected the combination of factors giving the best results. This data was turned over to a patent solicitor who incorporated it into a patent application and after many amendments and arguments persuaded the examiner to allow the claims in the Tolman patent.

Following the Tolman experiments in June 1932 plaintiff employed DeFlorenz & Co., a firm of chemical engineers in New York experienced in designing column stills for the petroleum industry. This firm assigned to plaintiff an engineer to design a distilling plant of commercial size for fatty distillation. At this time Goranflo, the other patentee, was engaged to represent the plaintiff in conferences with the engineer. It would appear that Goranflo suggested a bubble column for commercial use instead of the plate or baffle column disclosed in the Tolman application. He contributed nothing novel as the bubble column used by plaintiff is the conventional bubble column commercially employed for distillation long before the Goranflo application. It thus appears that a New York engineer was the designer of plaintiff's plant. Goranflo's contribution was merely the suggestion to substitute a well-known type of continuous distilling column for another equally well known column still for carrying out the same process disclosed by Tolman.

Goranflo had access to the log sheets of the operations of the Tolman still. His application contained a statement of the temperatures, pressures and quantities of steam and crude acid found to give the most desirable results. The preferred final temperatures, pressures and flows specified by Goranflo all fall within the range given in the Tolman patent. Thus the Goranflo claims define only the use of a bubble tower for the continuous distillation of fatty acid. This was not novel. The recorded data discloses nothing new.

A pot still is a small, inexpensive apparatus compared with a column still. At the present time both parties to this suit use pot stills for part of their output. They are the only ones using column or bubble tower stills. So far as known the fatty acid industry in this country other than the parties to this suit uses only pot stills. However, the column still is recognized by chemical engineers as the most efficient apparatus. Whether the improvement it affords is great enough to make up for the additional cost is a question.

In a pot still the acid is heated to its vaporizing temperature, superheated steam is blown into the vessel for the purpose of lowering the vapor pressure, the vessel is maintained under a vacuum to lower the boiling point and speed up the vaporization, and the fatty acid vapors as drawn off from the still are condensed into a purified commercial product. As the separation is a purifying operation wherein the volatiles are separated from the nonvolatiles, it is not necessary to maintain any critical temperature for the outgoing vapors from the still. In the pot still the nonvolatile residue accumulates in the pot. As the operation proceeds the composition of the material to be distilled is altered by the accumulating impurities retained in the pot. To re-

move such impurities the distillate is frequently redistilled.

In the column still there is a continuous withdrawal of the residue as well as the distillate from the still and consequently there is no change in the composition of the crude acid as the distillation progresses and likewise no change in the distillate. In the column still the acid is heated in a furnace and charged into the tower at a point near the top. Superheated steam is admitted at the bottom of the tower just as it is admitted at the bottom of the pot still. Instead of having a liquid mass of heated acid in a single bulk in the pot as in the pot still, the heated acid is spread out over the succession of trays so that the steam instead of bubbling once through the acid, as in the pot still, bubbles repeatedly through the different layers of acid on the successive trays.

The process of distillation in both tower and pot stills is precisely the same. The superheated steam lowers the vapor pressure and consequently the boiling point of the acid and at the same time gives up some of its heat to raise the temperature of the acid above its boiling point and the mixture of vaporized acid and steam passes out of the top of the column to the condenser.

As pointed out by defendant's expert the range of temperatures and pressures specified in the patents in suit cover the entire range of operations between volitalization and decomposition. The expert testified:

"Q. 15 What do you find to be the range of temperatures given in the patents for the material at the feed into the column, that is, the crude fatty acid? A. The preheated crude into the column is specified as within a range of from 400 to 600.

"Q. 16 In your opinion, is there anything critical or definite about that range of temperatures? A. There could not be anything critical or definite about a range of 200 degrees in the heating of a fat, in the heating of fatty acids for the purposes of distillation because you can not distill it at very much below 400 and if you heated it for any great length of time to 600 or anything much over 600 you would burn it up. So that those temperatures specify, rather, approximately the only range in which you could handle the material.

"Q. 17 What do you find to be the range of temperatures expressed in the patent for the vapor at the outlet of the distilling column, where it goes to the condensers? A. The vapor at the outlet is specified as 350 to 500 degrees Fahrenheit.

"Q. 18 Is that 500 or 550? A. 350 to 550 degrees Fahrenheit, with a vacuum of 22 inches.

"Q. 19 That is at a vacuum of 22 inches, approximately? A. Yes, sir.

"Q. 20 Is there anything in your opinion that is definite or critical about that range of temperatures? A. There is nothing critical about it because the range specified is so wide that it includes practically every possible temperature that you would get as a head temperature for the typical fatty acids that are commercially distilled.

"Q. 21 That is, the sort of greases that have been offered here as typical crude products? A. Including both animal and vegetable, yes.

"Q. 22 What do you find to be the range of temperatures for the discharge end of the tower? A. The residue is specified as being taken out at temperatures of 550 to 750 degrees Fahrenheit.

"Q. 23 Is there anything critical about that range of temperatures? A. Nothing whatsoever because, again, it is such a wide range that it permits you to take them out at practically any workable, any convenient temperature, in the operation of any of these plants, either pot still or a column still."

The column still is the most efficient known apparatus of its kind. Because it is more efficient a higher degree of purification is obtained with the column still than with the pot still. However, the application of the column still in the distillation of fatty acids was purely an engineering job and did not involve invention.

### State of the Art.

It appears from the evidence that the manager of defendant's plant at Carnegie built a small sized continuous distillation still in 1928, long before Tolman's application. It had about the same capacity as the Tolman still and yielded a high grade distillate except for metal discoloration. Such discoloration is avoided by the use of noncorrosive metals. In the spring of 1929 the plant was destroyed by fire. However, a sketch used for building this experimental apparatus and photographs of the still give a picture of its construction. From this sketch and photograph defend-

ant's manager made up a drawing of the still as built and operated at Carnegie. He is corroborated as to the layout by two other witnesses. The operation of this experimental still in 1928 is as much a contribution to the art as the Tolman still of a later date.

This six inch still was followed by the building of a pilot plant still constructed largely from pieces of pot still apparatus at hand. The Carnegie plant was on leased ground and the lease was about to expire. After the fire defendant was unwilling to make a substantial investment in new equipment. From the summer of 1928 until the fire in April, 1929 plaintiff operated a continuous column still and produced a high grade distillate. This was as much a practice of the process of continuous distillation of fatty acids as is the present practice of the parties.

Vaughan patent No. 49,689 issued in 1865 for the continuous distillation of petroleum and other materials. It shows the antiquity of the bubble tower. The mode of operation described in the patent is precisely the mode of operation of the tower of the Goranflo patent. The preheated material to be distilled is delivered to an intermediate tray in the tower and superheated steam is admitted under the bottom tray. The vapors are withdrawn from the top vapor outlet and the residue may be withdrawn from the bottom of the tower either continuously or at intervals as desired.

The excerpts introduced in evidence from the German text book by Karl Löffl, "Technologie der Fette und Öle", gives a good description of a continuous fatty acid distilling plant in operation in Germany. The apparatus and its method of operation as described in this book are in all essentials the same apparatus and process described in the patents in suit. Defendant's expert testified:

"Q. 53. As an engineer of long experience in the distillation of fatty acids, will you state whether or not in your opinion the disclosure of this article is an adequate disclosure of a continuous distillation process of fatty acids? A. Yes, I consider this an adequate disclosure of the process in that the various process steps are clearly specified and giving the temperatures of the essential process steps and diagrammatically showing all the essential parts of the still and accessory equipment required to operate the process."

This is a description of the "Bormann" plant in Germany. It gives a range of temperatures for the acid fed into the tower and for the vapors discharged from the tower. There is no significant difference in the range of temperatures recommended in this description of the Bormann plant and the temperatures employed in the old pot still distillation and those specified in the plaintiff's patents.

|  | Bormann | Tolman | Pot Still |
|---|---|---|---|
| Feed | 511°–547° | 400°–600° | 450°–550° |
| Vapors | 403°–502° | 350°–550° | 410°–425° |

The German book discloses the same pieces of apparatus as disclosed in the patent in suit, with the exception that the interior of the tower is not shown. The book, however, describes in detail the operation which takes place in the tower which is precisely the operation taking place in the distilling columns of the patents in suit. It states:

"Fig. 272. Continuous Bormann distillation plant.

"The heater U comprises a heating system for preheating the crude fatty acid and a steam superheater.

"The mode of operation is as follows: The crude fatty acid, preheated in a heatable overhead tank so as to be readily flowable, serves as a cooling liquid in the reflux condenser of the purifying column C prior to running at a into the float tank K. From the latter it is passed by means of pump P in an accurately controllable and always constant amount into the heater U. Here the heating of the crude fatty acid up to the distillation temperature of 280°–300° C. [511°–547° F.] takes place in a continuously acting heating system made of cast iron, at which temperature it is admitted at C into the distilling column A. At the same time superheated steam at about 350° C. [662° F.] is admitted from below at e into column A, rises upwardly in the latter in countercurrent to the fatty acid which trickles downwardly in a state of fine distribution, and during this it distills off all the vaporizable parts of the crude fatty acid in countercurrent.

"The fatty acid vapors and steam emerge from the column A through the cover elbow at a temperature of 220°–275° C. [403°–502° F.] and pass through an aluminum conduit into the evaporator B which is fitted with a heating system of aluminum tubes. In B the vapors are

cooled by water which is supplied at *f*. The water is thus vaporized, and the generated steam is led through the nipple *g* to the steam superheater in furnace U, in order to be used then as distillation—effecting steam in the column A."

Other citations likewise disclose processes of continuous distillation of fatty acids or analogous materials in column stills according to the procedure disclosed in the patents in suit. They are: Loomis U. S. Patent No. 1,756,032 (1930); Bollmann U. S. Patent No. 1,781,745 (1930); Armstrong British Patent No. 248,828 (1926); and Lamy-Torrilhon French Patent No. 637,969 (1928).

The patents in suit disclose nothing with respect to the question of entrainment not previously disclosed in the prior art. The prevention of entrainment in a distilling operation is a matter of engineering skill to be applied by an engineer in designing the equipment. If the prevention of entrainment in the fatty acid still required invention, the patents fail completely to point out and claim such invention.

### Law.

■ The difference between pot still distillation and continuous still distillation is in reality a difference inherent in different types of apparatus. A process in the patent sense is a series of steps involving physical or chemical changes in the material operated upon. It converts that material into something of different physical and chemical characteristics. Invention must be found in the sequence of steps performed on the material treated, not in the apparatus necessary to carry out the process.

■ The employment of continuous column or bubble stills in fields where they had not been previously used is not invention. The use of a bubble tower in lieu of a less efficient type of still has been held not to amount to invention.

"The court further found that the bubble tower in combination with a cracking still merely operates in accordance with the law of its being; that the results of such use were obvious and to be expected, and were neither new nor unusual; that all the advantages arising from such use were due to better fractionation and to the inherent nature of the bubble tower; and that the difference in efficiency between it and other fractionators was merely in degree and

not in kind." Standard Oil Co. v. Globe Oil & Ref. Co., 7 Cir., 82 F.2d 488, 493.

A similar attempt was made to patent the use of a column still for a particular purpose: "A steaming column and its function being so long and well known in the distillation art as to be a 'tool' of the art, no one may appropriate its use to himself and exclude others from using it in any usual way for any purpose to which it might be applied." Atlantic Refining Co. v. James B. Berry Sons' Co., D.C., 14 F. Supp. 891, 894.

■ The above cases are examples of the established rule of the Supreme Court that the application of an old process or machine to a similar or analogous subject does not amount to invention.

"The principle deducible from those cases is that it is not a patentable invention to apply old and well-known devices and processes to new uses in other and analogous arts." Lovell Manufacturing Co. v. Cary, 147 U.S. 623, 637, 13 S.Ct. 472, 477, 37 L.Ed. 307.

The rule may be more elaborately stated: "It is settled by many decisions of this court, which it is unnecessary to quote from or refer to in detail, that the application of an old process or machine to a similar or analogous subject, with no change in the manner of application, and no result substantially distinct in its nature, will not sustain a patent, even if the new form of result has not before been contemplated." Pennsylvania Railroad v. Locomotive Truck Co., 110 U.S. 490, 494, 4 S.Ct. 220, 222, 28 L.Ed. 222.

■ The enumeration in the claims of observed limits of temperature, vapor velocity, etc., even if not disclosed in the prior art, can not save the patent.

"All that Greene discovered or claimed to have discovered was that, by changing the proportions of the usual slag constituents, increasing one and decreasing the other, a better result could be accomplished; this result differing only in degree from that of the prior art. Such a discovery is not patentable. * * * This case comes clearly within the principle, so often declared, that 'a mere carrying forward of the original thought, a change only in form, proportions, or degree, doing the same thing in the same way, by substantially the same means, with better results, is not such an invention as will sustain a patent.'" Greene Process Metal

298

Co. v. Washington Iron Works, 9 Cir., 84 F.2d 892, 894.

 An attempt to patent a particular range of operation of an old apparatus for its intended purpose is not invention.

"Thus the invention is for mixing pectin and sugar ground fine within specified ranges. The combination of pectin or pectose and sugar ground fine was old. * * *

"A patentee may not arbitrarily select a point in a progressive change and maintain a patent monopoly for all operations in that progressive change falling on one particular side of that arbitrarily selected point. It is only where the selected point corresponds with the physical phenomenon and the patentee has discovered the point at which that physical phenomenon occurs that the maintenance of a patent monopoly is admissible. A claim must be based on invention." Kwik Set v. Welch Grape Juice Co., 2 Cir., 86 F.2d 945, 946, 947.

"While an invention should not be invalidated merely because it comes after experimentation, still the experiment which succeeds must require some ingenuity, if it is worthy of being granted a patent monopoly. * * * Merely to run down every obvious alley until the best route to the desired goal is found cannot be deemed invention. We cannot see that Fink did more. All his experiments were within the skill of any competent artisan in metal work." Fink v. V. Foscato, Inc., 2 Cir., 79 F.2d 842, 843.

 The improvement is not patentable invention. The mere carrying forward or making a new or more extended application of an old idea did not constitute invention.

"But a mere carrying forward or new or more extended application of the original thought, a change only in form, proportions, or degree, the substitution of equivalents, doing substantially the same thing in the same way by substantially the same means with better results, is not such invention as will sustain a patent. These rules apply alike, whether what preceded was covered by a patent or rested only in public knowledge and use. In neither case can there be an invasion of such domain and an appropriation of anything found there. In one case everything belongs to the prior patentee, in the other, to the public at large." Smith v. Nichols, 21 Wall. 112, 119, 22 L.Ed. 566.

The claims in suit, although in process form, define merely the observed operation of an old apparatus. Where a process is simply the function of a particular apparatus, it is not patentable.

The court finds both patents in suit invalid for want of patentable invention. Finding the patents invalid it is unnecessary to deal with the defense of non-infringement.

This opinion contains a statement of the essential facts and of the law applicable thereto in conformity with Rule 52 of the New Rules of Civil Procedure, 28 U. S.C.A. following section 723 c.

The bill must be dismissed.