## WHITE et al. v. E. L. BRUCE CO.
### Civil Action No. 406.

District Court, D. Delaware.
July 11, 1946.

See also 62 F.Supp. 577.

John J. Darby and C. Willard Hayes (of Cushman, Darby & Cushman), all of Washington, D. C., and Arthur G. Connolly, of Wilmington, Del., for plaintiffs.

Newton A. Burgess and John F. Ryan (of Burgess, Ryan & Hicks), both of New York City, John W. Maher, of Washington, D. C., and William H. Foulk, of Wilmington, Del., for defendant.

LEAHY, District Judge.

This suit for declaratory judgment puts in issue questions of validity and infringement of defendant's three patents, Partee & Gray 2,288,585, Partee & Gray 2,341,161, and Partee 2,276,253. Infringement of claims 1, 2 and 5 of '585 and claims 1, 2, 5, 6 and 7 of '161 are at issue. Claims 3 and 4 of '253 are in issue on validity, but the charge of infringement as to '253 has been withdrawn. '161 describes a finishing line. Raw oak, for example, is placed on a conveyor belt and is a finished hardwood floor strip when it leaves the production line twelve minutes later. During its journey the floor strip is subjected to five steps. Claim 1:

"The method of finishing wood flooring in an uninterrupted series of successive operations while the flooring moves continuously along a production line the steps comprising

"1. Applying uniformly to the wood a composition containing the necessary finishing elements, said composition being a penetrating seal type of finish which contains

"a drying oil base,

"a resin and

"a volatile solvent

"2. heating the wood and the applied composition by heat which penetrates both the composition and the underlying wood in order to

"remove moisture,

"volatilize the solvent and

"set the composition in the wood

"3. brushing and rubbing the finish-coated surface, while heated, to

"effect removal of surplus

"composition from the surface and

"substantially uniform distribution

"of the composition in the surface

"pores of the wood, to thereby produce

"a smooth, sealed, finished surface and

"4. finally applying wax to the surface of the wood while the latter is still heated and

"5. brushing the waxed surface to polish it."

1. '161 is a method patent and most of the evidence at trial was devoted to it. It describes a method of applying to wood flooring strips a thin varnish coating composition and a wax coating in the factory or mill before the flooring is laid on the job. The disclosures of '585 and '161 are similar. '585 claims an apparatus for finishing wooden flooring and '161 the method performed by the apparatus. '253 describes and claims an earlier apparatus and method for finishing flooring. In all the patents in suit a coating composition is applied by a spray or a flow device, is brushed and rubbed and some of the excess is removed.

2. Prior to the patents in suit the product was known, i.e., to apply coating compositions to wood flooring at the mill would produce prefinished or factory-finished flooring.[1]

3. Under the patents in suit a seal finish is applied to the surface which penetrates as the wooden floor boards move along a conveyor belt.

4. The finish is dried, wax is applied and polished. Penetrating seal finishes were not new.[2] They differ from ordinary varnish only in viscosity which is controlled by the amounts of volatile solvents added to varnish, e.g., drying oils and resins. Qualities of penetration depend upon porosity of the wood flooring and viscosity of the sealer composition.

5. '585 and '161 state, in their specifications, addition of a filler to the penetrating seal finish described in '253. The addition

---

[1] Dittmarr No. 1,510,465; 1,510,466; 1,510,467. Derr publication, Study in Present Day Wood Finishing.

[2] Lyons No. 2,066,296.

of a filler to a penetrating seal finish was not new.[3]

6. In '161 and '585 the floor strips are dried by infra-red lamps; brushed and rubbed; again dried by a second series of infra-red lamps; brushed by a series of three flat bristle brushes, a cylindrical brush and a flat bristle brush; and finally rubbed by steel wool buffers. In '253 the floor strips were racked and air-dried instead of infra-red lamp dried. In '585 and '161 the floor strips were subjected to an air blast to remove foreign matter and wax was then applied and polished. In '253, after air drying the floor strips were rubbed with a steel wool buffer and then polished with wax. All of this occurs as the floor strips pass along a conveyor belt.

7. The substantial d'fferences between disclosure of '585 and '161 and the prior art patent '253 are (1) infra-red lamp drying is substituted for racking and air drying and (2) a filler is added to the sealer, in place of being applied in a separate operation.

### 1. Heating and Drying.

8. '585 and '161 teach that the temperature of the wood and the composition is raised to 172° F. during the movement of the floor strips under the second infra-red heating section. The patents are silent about temperatures of the order of 360° in the surface of the wood and the applied composition. The heat applied by the infra-red lamps in '585 and '161 assists the evaporation of the solvents in the composition and it may be said to dry the floor strips. In accordance with the teaching of these two patents the heat of the infra-red lamps does not completely polymerize the oils in the coating composition. Complete polymerization under '585 and '161 cannot occur as a result of subjecting the composition on the floor strips to the infra-red lamps at radiations of the intensities and for the times specified in both patents.

Any polymerization which does occur is the result expected upon the application of heat.[4]

9. The patents in suit do not speak of reflectors behind the infra-red lamps. Infra-red lamps without such reflectors are approximately one-half of the intensities and the temperature rise produced by lamps having reflectors. Defendant's ex parte tests were conducted with infra-red lamps with reflectors.

10. '585 and '161 describe infra-red lamps but are not limited to radiant heat. The specifications speak of other means of heating. On the date of the alleged inventions it was known to dry coating on wood by convection (hot air)[5] or by radiant (infra-red) heat.[6] One of the advantages of infra-red radiations long known was acceleration of the drying operation and the consequent saving of time.

### Comment.

Prior to the patents in suit, prefinished flooring was made and sold. I fail to see how the six steps of operation for production as described in defendant's patents can constitute invention. Penetrating seals were no novelty. The substitution of infra-red for force drying did not amount to invention. The use of such radiation was well known for many coating compositions on many articles of manufacture; and while the patent speaks of brushing and rubbing the heated surface to remove surplus coating composition and to effect uniform distribution of the coating composition into the surface pores of the wood, the evidence is clear that it is immaterial whether the composition is brushed and rubbed while heated or while cold. No-one at trial could distinguish one sample of wood which had been heated and one which had been brushed and rubbed while cold. The application of wax and brushing of a waxed surface was conventional.

[3] Blackketter No. 1,316,674; Clarke No. 2,194,259.

[4] Quinn No. 2,321,937 teaches the use of infra-red lamps to dry and partly polymerize a resin ingredient applied to fibre board.

[5] Edgecumbe No. 1,860,664. Derr publication n. 1.

[6] Infra-red patents and publications PX. 14, items 6–17. The use of infra-red is described in a prior publication—Minutes of the Great Lakes Power Club where a bank of infra-red lamps was substituted for racking and air drying coating compositions on automobile floor boards.

Defendant's invention, then, is, as I see it, that the use of infra-red radiations of a sufficient intensity to raise the temperatures on the surface of the floor strips and the coating composition, so that the drying oils in the composition, linseed or chinawood oils, will be completely polymerized; the finished composition will have "a complete and final set," i.e., the finished product will be more durable. In short, invention consists of the use of radiant heat of an intensity to produce a high temperature on the surface of the wood so as to completely polymerize drying oils of the coating composition and in the surface pores of the wood in 1.75 minutes.

The experts differed as to whether the drying oils were polymerized within the time stated and at the temperatures cited. But it would appear from the testimony of one of defendant's experts that everyone skilled in the art knew that a baking in place of an air dried process made the finish more durable. Thus, if defendant has advanced proof that the heating for the short period specified in the patent results in complete polymerization of the drying oils in the coating composition, this result proximately comes about by using a procedure—infra-red radiation or convection—known in the art before the patents in suit. There is no invention in discovering latent qualities of previously unknown advantages in old procedures. General Electric Co. v. Jewell Incandescent Lamp Co., 66 S.Ct. 81. Moreover, the patents are not limited to infra-red radiation. Only claim 2 is directed to such heating. In fact, one of the joint patentees thought that "hot air" would carry out the rule of his patent. In the apparatus companion patent '585 claim 1 provides for "means for heating the coated surface of the wood." It thus appears that both the method and the apparatus patents are drawn broadly to cover all types of heating methods.

## 2. Prior Art.

11. Dittmarr knew of applying fillers and varnishes to prefinished floor strips in a production line and to brush and rub in the filler composition as the strips moved along a conveyor belt. Edgecumbe, too, discloses brushing and working-in a stain on shingles carried by a conveyor and heating the shingles to dry, set in the coating composition, and to oxidize the linseed oil in the composition.

12. '585, the apparatus patent, broadly covers a four-element combination (1) means for applying the coating composition to the surface of the strips, (2) means for heating the same, (3) means for polishing the heated surface, and (4) means for conveying the flooring past the aforesaid means in the order stated. There is no invention in these combinations of elements in view of the Derr publication, the Dittmarr and Edgecumbe patents.

13. Claims 3 and 4 of '253, another apparatus patent, were charged to be infringed, but this charge has been withdrawn. The patent is still before the court, however, on the issue of validity.[7] This patent is pertinent to the validity of '585 and '161. Application was filed for '253 on October 5, 1938, a date prior to the date of the alleged inventions in '585 and '161. '253 shows a method and apparatus which the parties stipulated had been in public use more than one year prior to May 6, 1941, the filing date of the applications which resulted in '585 and '161.

14. '253 describes an apparatus having the following elements:

1. Means for continuously moving a succession of units through the apparatus,

2. Means for applying a liquid composition to the surface of the units at a uniform rate of flow,

3. A spreader for distributing the composition,

4. A wiper for removing the excess composition, and

5. The distance between the spreader and the wiper being sufficient to permit most of the composition to penetrate the wood deeply.

15. The combination of elements of '253 involves no invention in view of the Lyons, Dittmarr and Edgecumbe patents.

[7] See D.C., 62 F.Supp. 577.

*Comment.*

Dittmarr's No. 1,510,465 (1924) and his companion patents '466 and '467 relate to applying finishing compositions to floor strips. Edgecumbe's patent shows an apparatus for coating and impregnating shingles with a penetrating stain. This patent shows a combination of elements and means to apply a penetrating sealer and calls for brushing, rubbing and working in the sealer and a gas fire oven for heating, drying and setting the composition.

Both the method patent '161 and the apparatus patent '585 are invalid for lack of invention over the prior art. The Derr publication—"Study in Present Day Wood Finishing"—describes all the methods mentioned in '161, except that Derr refers to a drying room or a steam heated oven instead of the infra-red lights. The article was published in 1932, prior to the commercial use of the infra-red lights to dry coating compositions.

Groven, filing in 1933, received patent No. 1,998,615 which he assigned to the Ford Motor Company. This has sometimes been referred to as the "basic" patent on the use of infra-red radiations to dry and bake coating compositions, in Ford's case, to dry enamel on automobile bodies. The use of such radiations for a drying operation was known before Groven. In 1923 Doyle was awarded No. 1,450,022 which describes use of radiations to dry printing ink on paper. Upon an application filed December 21, 1939, Quinn received No. 2,321,937. He shows method and apparatus for applying a resin coating composition to fibre board. Quinn describes use of infra-red lamps and he attributes to the use of such radiation the same advantages claimed by the patents in suit. For example, Quinn believed and said, "An important function of the infra-red rays is that of setting up and harden-ing certain resins that may be used either in the board itself, or, preferably, in the coating of the board. The infra-red ray has a peculiar power of causing certain resins to react when exposed to the ray. It is believed that the setting up and hardening is due in part to the *polymeriza-tion of certain of the resins* * * * Where such resins are used with an ordinary water-insoluble paint, the infra-red lamps perform the double function of drying the paint by evaporation or oxidation of the solvent and will, at the same time *set up* and *harden* the resins present. Consequently, the process is very considerably shortened in both the space and time of operations." (Emphasis added.)

The same teaching is found throughout the publications dealing with infra-red radiation and all prior to the alleged inventions in suit.[8] Attention given to infra-red drying for coating compositions appears, again, as early as 1939 in the Minutes of the Spring Meeting, May 1939, of the Great Lakes Power Club. It is there reported:

"Manufacturer of automobile floor boards installed a 70 kw bank of lamps to speed up his production, save floor space and minimize handling costs. This plant had experience with air drying of these boards. After spraying, they were put on racks and left to dry for hours and even a day's drying was not unusual during muggy weather. This meant the loss of valuable floor space and also an appreciable handling expense. A 70 kw bank of lamps was installed over a conveyor beyond the spray booth and the boards are now packed for shipment at the end of the conveyor line only a few minutes after they have been sprayed." It would thus appear that automobile floor board manufacturers suggested methods which anticipated the patents in suit.

---

8 Electrified Industry (Oct. 1939), "Those Infra-Reds," p. 3; Electrified Industry (Nov. 1939), "Electrified Industry Suggests Infra-Red Lamps for Drying," p. 557; Electrified Industry (Dec. 1938), "Radiant Energy Drying," p. 20; General Electric Review (April 1939), "Drying with Near-Infra-Red Radiation," pp. 145–149; Chemical and Metallurgical Engineering (Feb. 1940), "Paint Baking with Near-Infra-Red," pp. 106–108; Factory Management and Maintenance (July 1939), "Quicker Drying with Lamps"; Illuminating Engineering (Jan. 1941), "The Use of Radiant Energy for the Application of Heat," pp. 61–78.

While no formal finding has been made above, there was evidence pointing to invalidity for lack of invention over two prior public uses. Boynton & Co., Chicago, Illinois, manufactured for Armour & Company 100,000 wooden boxes, for packaging cosmetics for the 1939 Christmas trade. It appears that a sealer was sprayed, through a spray booth, on the wooden boxes, mounted on a conveyor, which passed through two tunnels, each having infra-red drying lamps. Another instance involved the Murray Corporation which showed that in 1935 it had long been the standard practice in the automobile industry to dry varnished coatings on station wagon bodies by the use of infra-red drying lamps.

■■ Defendant seeks to reject all of the infra-red patents and publications by arguing that not one of them exactly anticipates the patents in suit. Defendant says, "There is no reference in this prior art to the use of infra-red for the particular purpose for which it is used in '161 and '585." This would appear to be an argument that invention is involved in the new use of an old method. But the new use of an old machine or method does not constitute patentable novelty. The application of an old method or appartus to a similar or analogous subject will not sustain a patent, even if the new form of result has never before been contemplated. Floridin Co. v. Attapulgus Clay Co., 3 Cir., 125 F.2d 669; United States Hoffman Machinery Corp. v. Pantex Pressing Machinery Corp., 3 Cir., 44 F.2d 685; New Process v. Hardesty Co., Inc., D.C.Del., 30 F.Supp. 292. See also, Lovell Manufacturing Co. v. Cary, 147 U.S. 623, 13 S.Ct. 472, 37 L.Ed. 307; Blake v. City of San Francisco, 113 U.S. 679, 5 S.Ct. 692, 28 L.Ed. 1070; Concrete Appliances v. Gomery, 269 U.S. 177, 46 S.Ct. 42, 70 L.Ed. 222; Butler Mfg. Co. v. Enterprise Cleaning Co., 8 Cir., 81 F.2d 711; International Steel Wool Corp. v. Williams Co., 6 Cir., 137 F.2d 342.

### 3. Validity.

■ 16. The conclusions under this branch of the case are that claims 1, 2 and 5 of Partee & Gray Patent No. 2,288,-585 are invalid for lack of invention over the prior patent to Partee No. 2,276,253, or the Derr publication, or the patents of Dittmarr Nos. 1,510,465, 1,510,466, 1,510,-467 or Edgecumbe No. 1,860,664, describing the use of infra-red radiations to dry coating compositions.

■ 17. Claims 1, 2, 5 and 7 of the Partee & Gray patent No. 2,341,161 are invalid for lack of invention over the prior patent to Partee No. 2,276,253, or the Derr publication, or the patents to Dittmarr Nos. 1,510,465, 1,510,466, 1,510,467; or Edgecumbe No. 1,860,664, showing the use of infra-red radiations to dry coating compositions.

■ 18. Claim 6 of the Partee & Gray patent No. 2,341,161 is invalid for lack of invention over the same prior patents and publications in view of the patents to Blackketter No. 1,316,674, and Clarke No. 2,194,259, showing the addition of a filler comprising solid particles suspended in a volatile solvent.

■ 19. The Partee patent No. 2,276,-253 is invalid for lack of invention over the Derr publication, or the patents of Dittmarr Nos. 1,510,465, 1,510,466, 1,510,-467, or Edgecumbe No. 1,860,664, or Lyons No. 2,066,296.

### 4. Infringement.

Defendant charges that only claims 1, 2 and 5 of the apparatus patent '585 and claims 1, 2, 5, 6 and 7 of the method patent '161 have been infringed. The charge of infringement of the earlier patent '253 originally directed to claims 3 and 4 thereof has been withdrawn.

It is tacitly conceded that a consideration of claim 1 of '585 is sufficient to determine the question of infringement. That claim reads: "An apparatus for finishing wood flooring comprising means for applying a composition to the surface of the wood, means for heating the coated surface of the wood, means for polishing the heated surface of the wood and means for conveying the flooring past the aforesaid means in the order stated." Plaintiffs' defense is that the employed process is manual instead of some mechanical operation

being used to apply the composition to the surface of the floor strips.

With respect to '161, it is likewise agreed that claims 3, 4, 8 and 9, which contemplate a second heating step, are not infringed. The parties agree that claim 1 is a typical claim of the '161 patent. Discussion was limited by the parties to that claim. That claim reads as follows:

"The method of finishing wood flooring in an uninterrupted series of successive operations while the flooring moves continuously along a production line the steps comprising,

"1. applying uniformly to the·wood a composition containing the necessary finishing elements, said composition being a penetrating seal type of finish which contains a drying oil base, a resin and a volatile solvent,

"2. heating the wood and the applied composition by heat which penetrates both the composition and the underlying wood in order to

"(a) remove moisture,

"(b) volatilize the solvent and

"(c) set the composition in the wood,

"3. brushing and rubbing the finish-coated surface while heated to

"(a) effect removal of surplus composition from the surface and

"(b) substantially uniform distribution of the composition in the surface pores of the wood, to thereby produce a smooth, sealed, finished surface, and

"4. finally applying wax to the said surface of the wood while the latter is still heated and

"5. brushing the waxed surface to polish it, the aforesaid operations being carried out in the order stated."

Plaintiffs advance two reasons why they do not infringe this patent. They say, (a) "that in plaintiffs' line, infra-red radiations of sufficient intensity to raise the temperature to 'set' the composition, * * * were not employed"; and (b) "Plaintiffs' method did not include the rubbing step of the claims in suit."

20. Plaintiffs' plant was destroyed by fire after the instant action was commenced. The fire occurred several weeks after the case came to issue. The defendant was put to difficulty in ascertaining the exact details of plaintiffs' operation in their floor finishing line. Nevertheless, the evidence shows plaintiffs used the teachings of '161 and '585 patents by pre-finishing floor strips on a continuously moving production line by applying to the wood a penetrating seal finish, containing materials specified in the patents, heated the wood and the composition with infra-red heating, brushed and rubbed the surface and applied wax, which was also polished. The floor strips, after undergoing process in plaintiffs' factory, could be immediately bundled, shipped and sold as flooring.

21. Plaintiffs had no prior experience in manufacturing pre-finished flooring prior to the latter part of 1942. No-one in their employ had such experience. They entered into the manufacture of finished floor strips at the request of a person who was then a customer of defendant. This person had been permitted by defendant to inspect its plant in operation. That person related to one of plaintiffs, and plaintiffs' plant manager, what he knew of defendant's operations. Defendant's customer took plaintiffs to inspect several installations of defendant's product; and he also furnished plaintiffs with samples of defendant's product and penetrating floor finish.

22. Defendant's commercial installation used only the second lamp bank containing 130 infra-red lamps. Plaintiffs duplicated similar heat action in the lamps they employed. They also duplicated the finished material of defendant by using a composition containing 37.8% of oils and resins in volatile solvent as compared with 39.8% of those substances in use by defendant.

23. Plaintiffs' production line utilized all the essential features of defendant's patents. Plaintiffs did not substitute or add an essential element in differentiation. Defendant's '585 patent had issued when plaintiffs constructed their production line. It is fair to draw from the evidence that plaintiffs learned and copied defendant's commercial operation.

Under this branch of the case, it is concluded that if defendant's patent No. 2,288,585 is valid, then plaintiffs have infringed claims 1, 2 and 5 of said patent; and that if defendant's patent No. 2,341,161 is valid, plaintiffs have infringed claims 1, 2, 5, 6 and 7 of that patent.

A decree should be submitted in accordance with the foregoing, awarding judgment to plaintiffs and dismissing defendant's counterclaim.