### PENNSYLVANIA CRUSHER CO. et al. v. BETHLEHEM STEEL CO. et al.

Civ. A. No. 6815.

United States District Court
W. D. Pennsylvania.

Feb. 9, 1951.

Pennie, Edmonds, Morton & Barrows, W. Brown Morton and Frank A. Bower, all of New York City, Harry S. Dunmire, Pittsburgh, Pa., for plaintiffs.

Harker H. Hittson, Columbus, Ohio, Brown, Critchlow, Flick & Peckham, Jo. Bailey Brown and Julian K. Miller, all of Pittsburgh, Pa., for defendants.

FOLLMER, District Judge.

The plaintiffs, Pennsylvania Crusher Company (hereafter referred to as "Penn-

sylvania") and Marguerite C. Schacht, Administratrix of the Estate of William H. Schacht, Deceased, (hereafter referred to as "Schacht") bring this action against the defendants, Bethlehem Steel Company (hereafter referred to as "Bethlehem") and The Jeffrey Manufacturing Company (hereafter referred to as "Jeffrey") alleging infringement of Claim 2[1] of a method patent No. 2,155,151 issued to William H. Schacht on April 18, 1939, and claims 4, 6, 9, and 10[2] of Patent No. 2,149,571 issued March 7, 1939, to Pennsylvania as Assignee of William A. Battey (hereafter referred to as the "Battey Patent"). The action is by Pennsylvania as licensee and Schacht as owner of the Schacht Patent, and by Pennsylvania as owner of the Battey Patent. Plaintiff Schacht is not concerned with the Battey Patent. The two patents involve two separate and distinct features which are the subjects of the alleged infringement, and will be considered separately.

Two machines (hereafter described) and the method of operation thereof are alleged to constitute infringements of the two patents in suit. The defendant, Bethlehem, is charged with infringement of both patents in the use of the two machines at its Johnstown, Pennsylvania, plant. Jeffrey is charged to be a contributory infringer of both patents in suit and also a direct infringer of the Battey Patent No. 2,149,571. Jeffrey has assumed the defense of the entire action.

From the pleadings and proof I make the following Findings of fact:

A. Generally.

1. Defendant Jeffrey manufactured and sold two 42" x 82" Type "B" swing hammermills to the defendant Bethlehem, which were ordered in April 1939, and placed in operation by Bethlehem not later than March 14, 1940, and have been in substantially continuous operation since that date.

2. Defendant Jeffrey has for many years manufactured and sold swing hammermills, such manufacturing and selling extending back at least as early as 1909. The machines alleged to constitute infringement of the patents in suit were manufactured by Jeffrey and sold to Bethlehem. They are swing hammermills with a central feed opening above the hammer rotor, which is mounted for rotation on a horizontal axis. Grate bars are positioned on each side of and adjacent to the bottom of the rotor but with a wide opening directly below the rotor through which tramp material may escape. Breaker plates are symmetrically arranged on each side of and above the rotor, and there is a projecting nose near the bottom of each breaker plate, which in operation is adjusted so as just to clear the hammers rotating past it. These Jeffrey-Bethlehem machines, except for the presence of breaker plates on both sides of the rotor, are essentially the same in structure as the 42" x 48" Type "B" Jeffrey Pulverizer, which has been manufactured and sold by Jeffrey for many years, long antedating the patents in suit.

B. As to Schacht Patent.

3. William H. Schacht filed an application for patent on a method of crushing on March 26, 1934, which was designated

1. The complaint covers claims 2, 3, and 4 of the Schacht Method Patent but plaintiffs withdrew claims 3 and 4 and rested on claim 2 (Transcript of Testimony, Page 6). Schacht Apparatus Patent No. 2,155,150 (claims 14 and 21) was declared upon but not pressed. In plaintiffs' brief (Page 15) they state, "We are not concerned here with the structural design of the Schacht crusher because neither party to this suit employs that design. As stated above, we have decided not to press the charge of infringement with respect to the Schacht apparatus Patent 2,155,150. The applica-

tion for this patent was included in the Hartshorn-Schacht Interference on the theory that claims 14 and 21 were sufficiently broad to cover both the Schacht and Hartshorn apparatus. However, in reading these claims as they should be in the light of the Schacht specifications, we feel that it requires a strained interpretation of their terms to include the hammermill type of crusher manufactured by the parties to this suit." See also Page 1 of plaintiffs' brief.

2. The complaint included claim 5 of the Battey Patent but this was withdrawn. (Transcript of Testimony, Page 6.)

as a continuation-in-part of an application filed on January 7, 1933, which continuation-in-part issued as Patent No. 2,155,151 on April 18, 1939. This patent contains only method claims, and only claim 2 is declared upon in this suit.

4. The Schacht Patent No. 2,155,151 relates to a method of crushing material in which the particles to be crushed are fed into the path of the impact members, allegedly with sufficient velocity in relation to the speed and spacing of those members to carry substantially each particle of the stream fully into the path of an impact member, whereby it is squarely hit. Claim 2 of this patent is directed to a method of reducing material by impact in a primary single stage and is not concerned with secondary reduction.

5. Dechamp Patent No. 248,923 issued November 1, 1881, covers a disintegrating apparatus for use on a wide range of materials, which apparatus bears a striking similarity to that of Schacht, the construction being the full equivalent of that shown as Figure 6 in Schacht Patent No. 2,155,151. The Dechamp Patent teaches reduction by the penetration and impact principle more adequately, more in detail, with more of the variable factors involved, than does Schacht, and fully anticipates method claim 2 of Schacht Patent No. 2,155,151.

6. Tomlinson Patent No. 1,331,969 covers a rotary impact pulverizer which employs and fully anticipates method claim 2 of Schacht Patent No. 2,155,151.

7. Jeffrey manufactured and sold a swing hammer pulverizer predicated, with some modifications, upon Liggett Patent No. 1,125,137 issued January 19, 1915, and at least as early as 1926 in its Catalogue No. 368A in connection therewith called attention to the fact that variations in speed affected the obtaining of adequate impacting for different materials and also that the height of the feeding point had a bearing upon the efficiency of the machine. This was an anticipation of Schacht and an earlier recognition than Schacht's of the fundamental principle that greater penetration was obtained by increasing the velocity of the falling particles.

8. Patent No. 1,257,619 of C. S. Lincoln (Assigned to Allis-Chalmers Manufacturing Company) issued February 26, 1918, was for a portable crusher which in its method of operation employed the same fundamental laws of physics involved in Schacht's claim 2, and fully anticipated said claim. Allis-Chalmers started manufacturing this machine as early as 1915.

9. In 1924 the Allis-Chalmers Manufacturing Company of Milwaukee, Wisconsin, sold to Joseph N. Hanley a "portable crusher" outfit constructed in accordance with Lincoln Patent No. 1,257,619 in which the limestone was reduced by a jaw crusher and then elevated and dropped a distance of approximately five and one-half feet into a No. 1 Allis-Chalmers Pulverator. This portable unit was known as the "A-C Hummer." The vertical chute down which the material was dropped contained no baffles. It was publicly used for a number of years in the reduction of limestone. Its use involved the same principles of penetration and direct impact obtained through velocity attained in a gravity fall of the material and fully anticipated claim 2 of Schacht's Patent No. 2,155,151.

10. Not later than 1928, Allis-Chalmers Manufacturing Company printed and circulated its Bulletins Nos. 1452 and 1467, the latter being copyrighted in 1928. Said Bulletin No. 1452 on pages 3 and 4, and said Bulletin No. 1467 on pages 3, 4, and 5, fully disclose, illustrate and describe reduction of limestone by the penetration or impact principle. Each of the Allis-Chalmers Bulletins Nos. 1452 and 1467 constitutes a publication which shows anticipation of, and lack of invention in claim 2 of Schacht Patent No. 2,155,151.

11. In 1920 the Vermarco Lime Company at West Rutland, Vermont, had in operation a swing hammer pulverizer manufactured by the Universal Crusher Company of Cedar Rapids, Iowa, and sold by the Brainard Pulverizer Company of Chicago, Illinois, under the designation of a No. 18 Brainard Pulverizer. In this installation velocity was obtained by gravity in a free fall of the material to be pulverized, resulting in penetration and full face

impact by the hammers. It was an utilization of the same fundatmental principles and fully anticipated claim 2 of Schacht Patent No. 2,155,151.

C. As to Battey Patent.

12. William A. Battey filed an application for patent on a hammermill on Octomer 30, 1936, which issued as Patent No. 2,149,571 on March 7, 1939. Only Claims 4, 6, 9, and 10 are declared upon in this suit. These four claims involve substantially the following:

(a). "A reversible hammermill comprising a housing" in claims 4, 6, 9, and 10.

(b). "A crushing chamber within the housing and having a substantially horizontal axis" in claim 4.

"A crushing chamber" in claim 6.

"A crushing chamber within the housing and having a substantially horizontal axis, said crushing chamber having its opposite sides symmetrical with relation to a longitudinal vertical plane containing the chamber axis" in claims 9 and 10.

(c). "A system of hammers in the chamber rotated as a unit around a substantially horizontal axis" in claim 4.

"A system of swinging hammers in the chamber maintained in operative position by centrifugal force and rotated as a unit" in claim 6.

"A system of pivoted hammers in the chamber rotated as a unit around a substantially horizontal axis parallel with the axis of said chamber" in claims 9 and 10.

(d). "Means for rotating the hammer system at impact-crushing speed" in claim 4 but omitted in claim 6.

"Means for rotating the hammer system at impact crushing speed in either direction to initially fracture the material being crushed" in claims 9 and 10.

(e). "A feed inlet located centrally over the hammer system" in claims 4 and 6.

"Inlet means opening through the upper portion of the chamber wall and symmetrically arranged with reference to said vertical plane containing said axis for introducing the material to be crushed into the chamber over said hammer system" in claims 9 and 10.

(f). "A separate breaker plate at one side of the inlet mounted in the housing and spaced from the hammer path by a distance greater than the diameter of the largest piece of material to be crushed" in claims 4 and 6.

"A breaker plate forming a wall of said chamber at one side of said plane and mounted in the housing and spaced from the hammer path by a distance greater than the diameter of the largest piece of material to be crushed" in claims 9 and 10.

(g). "Positioned to intercept material from the inlet impacted by the hammers when rotated in one direction" in claims 4 and 6.

"Acting to intercept material from the feed means impacted by the hammers when rotated in one direction" in claims 9 and 10.

(h). "A separate breaker plate at the other side of the inlet mounted in the housing and similarly spaced from the hammer path and positioned to intercept material from the inlet impacted by the hammers when rotated in the other direction" in claims 4 and 6.

"Another breaker plate forming an opposite wall of said chamber and symmetrically mounted at the other side of said plain with respect to the first mentioned breaker plate and similarly spaced from the hammer path and acting to intercept material from the feed means impacted by the hammers when rotated in the other direction" in claims 9 and 10.

(i). "A discharge outlet for crushed material" in claim 4.

"A discharge outlet for the crushed material through the lower portion of the chamber below both of said breaker plates" in claim 9 but omitted from claims 6 and 10.

(j). An additional secondary stage is added in claims 6 and 10 as follows:

Claim 6, "a screen located below the hammer system having edges extending transversely to the direction of travel of the hammers and positioned to support oversize in the hammer path."

Claim 10, "a secondary crushing zone having crushing screens provided with dis-

charge opening edges generally parallel to said axis of the hammer system and located symmetrically adjacent the lower portion of the hammer path in position to provide abrasive action between the hammers, bars and interposed material."

13. In 1909 Jeffrey designed and manufactured and as early as 1910 sold hammermills known as 16" x 12" Type "B" Pulverizers, which were reversible symmetrical machines equipped with swing hammers having identical faces for impacting in either direction of rotation, such hammers being supplied in various materials, including manganese steel according to the customer's requirements. The machines had duplicate breaker plates symmetrically located on opposite sides and had symmetrically arranged screen bars around the sides and bottom of the machine. Such machines were actually operated in both directions by purchasers thereof. They had a substantially center top feed. The machines fully anticipated claims 4, 6, 9, and 10 of the Battey Patent, and would produce all the results claimed for the Battey construction.

14. In 1915 Jeffery manufactured and sold a fully symmetrical reversible swing hammer type hammermill known as a 30" x 24" corn cob hammermill. It had a restricted center top feed opening. Its distinguishing characteristic was in having a duplicate set of breaker bars as more suitable for the particular purpose for which it was designed than breaker plates, but it would constitute neither novelty nor invention to use the duplicate breaker plates as in the 1909 machine for harder materials, or conversely to use the restricted opening of the 1915 type on the 1909 machine instead of the reversible top plate. Claims 4, 6, 9, and 10 of the Battey Patent were anticipated by this machine.

15. A centrally located top feed inlet for symmetrically constructed hammermills and pulverizers was well known in the prior art, as illustrated by the 30" x 24" hammermill manufactured in 1915 by Jeffrey and such patents as Jordan Patent No. 249,-770 (Defendants' Exhibit No. D–128), De Maio Patent No. 930,742 (Defendants' Exhibit No. D–128), the Sandri (German)

Patent No. 89,783 (Defendants' Exhibit No. D–128), and Griffin (British) Patent No. 364,954 (Defendants' Exhibit No. D–126), and was well known in the prior art for hammermills generally, as for example, the Jeffrey 42" x 48" Type "B" Pulverizer, the Borton Patent No. 759,856 (Defendants' Exhibit No. D–127), Whelpley Patent No. 40,072 (Defendants' Exhibit No. D–128), and Meneraud (French) Patent No. 458,745 (Defendants' Exhibit No. D–127).

16. There was no novelty or invention involved in substituting "a feed inlet located centrally over the hammer system" or "inlet means opening through the upper portion of the chamber wall and symmetrically arranged with reference to said vertical plane containing said axis for introducing the material to be crushed into the chamber over said hammer system" in place of a top center inlet restricted by a reversible plate as in the 1909 Jeffrey machine, nor would such change add any additional functions to the machine.

17. The Jeffrey-Bethlehem 42" x 82" machines involved in this action are the Jeffrey 42" x 48" Type "B" Pulverizers, which were well known in the prior art, enlarged and modified only by a duplication of the breaker plates on opposite sides of the machines and involved only an obvious mechanical variation fully taught by the prior art machines such as Jeffrey's 1909 and 1915 machines. Such change involved no novelty or invention or new or unexpected results.

18. The claimed new result of "resharpening" would occur equally under the same conditions in the Jeffrey 1909 machine, and would also occur in the Crites apparatus during the impacting and crushing action as the material is driven tangentially along the screen bars.

19. "Resharpening" of the hammers occurs only where the hammers are of a special alloy steel such as manganese steel, where the material treated consists of a hard substance (harder than coal) such as limestone. The Battey Patent contains no such limitations, nor does it indicate the frequency of reversal required.

20. The Jeffrey-Bethlehem machines are used for the pulverizing of coal and the hammers do not consist of a special alloy such as manganese steel.

## Discussion

Jeffrey manufactured and sold to Bethlehem two 42" x 82" Type "B" swing hammermills, which had been ordered about April 1939, installed and operated not later than March 14, 1940. They have been in substantially continuous operation since that time. The method of operation and the construction of these two machines are alleged to constitute infringements of the two patents in suit.[3] The two hammermills have been used by Bethelehem for the crushing of coal of a size range of approximately one inch to zero. The coal is fed to the hammermills from overhead through a chute having an inclined upper portion and a lower vertical portion with a free drop of the coal of approximately six feet before reaching the cylindrical line described by the hammer path or circle of the hammers outer edges.[4]

3. Stipulation, Plaintiffs' Exhibit No. P–28.

4. The Stipulation of the parties (Plaintiffs' Exhibit No. P–28) describes the machines in detail as follows:

"Referring to Exhibit A, significant features of the two crushers sold by the defendant The Jeffrey Manufacturing Company to defendant Bethlehem Steel Company, as above set forth, comprise an outer casing of generally rectangular configuration. The hammers which strike the material to be crushed are supported for continuous rotation on a heavy horizontal shaft extending across and perpendicular to the ends of the casing, the axis of said shaft being at a point about one-third the distance from the bottom of the casing to the feed chute through which the material to be crushed is delivered into the casing to be engaged, and impelled and at least partially crushed by the rotating hammers. The impelled material will strike one or the other of the breaker plates at opposite sides of the casing where there will be additional crushing. The breaker plates are adjustable and in the accused machines they are adjusted toward the hammer path or circle until they just clear the hammers, the clearance being only a small fraction of an inch, of the order of 1/16 in.

"In each of the accused crushers there are 105 hammers each weighing approximately 16½ pounds. The hammers are arranged in three rows of 18 each, and three alternate rows of 17 each. They are mounted to swing on rods extending substantially from end to end of the casing, the rods being supported by a series of 1 inch thick disks keyed to the shaft for rotation therewith, the disks being 36 in number and spaced apart a distance of 1–5/16 inch which is slightly greater than the thickness of the hammers, which is 1–1/4 inch, thereby permitting the hammers to swing freely in the operation of the crusher. There are three hammers between each pair of disks, spaced 120 degrees apart. The areas between which adjacent trios of hammers rotate are axially spaced apart 1–1/16 in. The hammers are 13½ inches long, 3½ inches wide and 1–1/4 inch thick and at their centers project 7–1/4 inch beyond the rotor disks when extending radially. The diameter of the hammer path or circle is approximately 42 inches. The hammers in each row are staggered with respect to the hammers in the adjacent rows. The crushers operate at 735 R.P.M.

"The feed chute for the material to be fed into the crusher extends from end to end of the casing immediately over the top of the hammers and parallel with the axis of the shaft in the casing. That is to say, the feed chute is centrally located with respect to the casing and the rotating hammers, so that the material fed to the casing will drop by gravity with some of it falling directly into the paths of the rotating hammers where it will be impacted by the hammers in precisely the same manner, regardless of the direction of rotation of the hammers. During the initial drop some of the particles of material will fall between axially adjacent sets of hammers. The coal delivered through the feed chute has a free drop of approximately 6 feet before reaching the cylinder described by the axially adjacent hammer circles or paths.

"The casing is symmetrical with respect to the central vertical axial plane of the crusher so that the material struck by the hammers in either direction of rotation of the hammers will be driven against one of the breaker plates lining the upper portion of the casing, to be thereby further crushed and returned by gravity into the path of the hammers. The lower part of the casing below the axis of the shaft is formed on each side by a series of grate bars extending from end to end of the casing and arranged in an arcuate path so as to allow a clear-

### The Schacht Patent

Claim 2 of the Schacht Patent No. 2,-155,151 for method of crushing is

"2. The method of impact crushing which includes, first, projecting by gravity, and along a generally defined path, a stream of the particles to be crushed; moving transversely through said path a succession of impact members, at such speed and momentum as will cause adequate crushing impacts to the dropping particles of said stream; maintaining the velocity of the particles fed into the crushing zone formed by the intersection of the path of feed and the path of the impact members sufficiently high, in relation to the speed and spacing of the successive impact members, to carry substantially each particle of the stream fully into the path of the impact member which impacts it, whereby such particle is positioned to be squarely impacted by the impact face of such impact member, and thereafter withdrawing the broken particles from the crushing zone."

The application for this patent had been refused, and a series of amendments had been refused by the Examiners. On appeal in the Patent Office to the Board of Appeals affidavits of experts were introduced, typical of which is the Hotchkiss affidavit,[6] including the statement in reference to prior patents that

"It is obvious that the references mentioned above fail to employ the principle or (sic) impact crushing as employed by Mr. Schacht. He uses an impeller or (sic) large diameter, massive construction and higher speed, in order to obtain the momentum necessary for imparting crushing blows; and he employs roller bearings, to acquire the high speed necessary. He feeds the material at high velocity through a steeply inclined chute, unobstructedly and in an unconsolidated stream into the path of the impeller impact members, which latter are spaced farther radially from the center and circumferentially from each other, and he maintains a definite relation between the velocity of the feed and the velocity of the impeller impact members, to permit the free entrance of *all* of the material *completely* into their path. Having accomplished the latter, he employs an impeller with sufficient momentum and adequate construction to impart full crushing impacts to the material.

"It is my opinion that none of the references cited claims or uses his principle of impact crushing, and further, that they cannot use it and accomplish his results without completely altering and rebuilding these machines to meet the requirements that I have enumerated above."

Plaintiffs now say "The mechanical change required to modify an old crusher to embody the Schacht invention is small."[7]

As sales talk, this so-called method has been designated the "high drop feature." Plaintiffs now seek to change Schacht's claim so that in effect it would read "a vertical free drop of the material." They say,

"In the simplified drawing (Pltf's. Exh. 30) we have shown the essential elements of the crusher as required for carrying out the Schacht method as disclosed in the Schacht method patent 2,155,151. As here shown, the crusher comprises three 'hammers' or impact members carried by and driven at a high speed by a driving shaft.

"Completely surrounding the rotating hammers and spaced from the hammers by a substantial distance are the breaker plates against which the material is driven by the hammers after receiving the first crushing impact from the hammers. The material is

ance of approximately 3/8 in. between the end of the hammers (when new) and the inner faces of the grate bars. The grate bars on each side of the lower half of the casing extend through an arc of about 55°, leaving an open space at the bottom of the casing of about 70°. The motor employed for rotating the hammers is a reversible motor so that the direction of rotation of the hammers may be reversed at will without making any change in any part of the apparatus."

5. Plaintiffs' Exhibit No. P–26 (Schacht Patent No. 2,155,151) Page 4, Column 2, Line 15.

6. Defendants' Exhibit No. D–141, Proceedings in Patent Office on Schacht application, Pages 74–80, at Page 79.

7. Plaintiffs' Brief, Page 16.

fed vertically into the path of the rotating hammers by a feed chute through which the particles to be crushed are projected by gravity at a velocity sufficient, in the language of the claims, to 'carry substantially each particle fully into the path of the impact member which impacts it'. It is the use of this element, *the central vertical feed of sufficient height to impart the specified velocity* to the particles to be crushed which distinguishes the Schacht invention from the crushers of the prior art as built and operated by the parties to this action for many years prior to the date of the Schacht invention. The mechanical change required to modify an old crusher to embody the Schacht invention is small. All that was required was a change in the location of the feed to a position vertically over the path of movement of the rotating hammers and to elevate the feed to such position that the entering material will be projected by gravity transversely across the path of movement of the rotating hammers at a velocity to be projected fully into the path of the hammers before being struck by the hammers, and thereby receive the full shattering impact of the hammers. * * * " [8]

The decisive answer to this is that Schacht uses as his example of the embodiment of the "method" his own apparatus covered by Patent No. 2,155,150 [9] in which "The feed chute G[5] may be steeply inclined, at an angle of 60 degrees more or less." [10] As a matter of fact, in Schacht's apparatus he uses a reflector ring with striker plates which revolved in an opposite direction from the impeller plates or hammers instead of the stationary breaker plates used in the type of impactors known as hammermills, which would render it impossible to have a free vertical gravity drop

into the machine. It must be by an inclined chute entering the side of the machine. [11] At one point he speaks of free gravital fall, but the context shows he is referring to the fall of the material into the path of striking plates. Such free gravital fall exists at the point of fall for impacting in the space between hammers in any ordinary hammermill. As far as his "method" is concerned, he is merely calling attention to the fact that maximum efficiency is obtained by maximum penetration of the falling particles into the hammer path in order to receive direct impact of the hammers. [12] Schacht says: "The falling particles attain sufficient velocity relative to the velocity of the impeller striking plates $B^3$ to reach the path of the impeller plates before they are struck and the rates of rotation and the length of fall are preferably so timed and arranged that the particles make a full and complete contact with the faces of the striking plates $B^3$ rather than merely being struck by the top edges only." [13] Schacht recognizes that the same principles of physics are involved whether gravity or some other means is used. He states: "While I prefer to employ gravity as the means for imparting to the material the proper speed for carrying it into the primary crushing zone, it will be understood that I may practice my method with the employment of other means for accelerating the particles to be crushed. I may, for example, project a stream of particles into the crushing zone by any suitable mechanical means, conveyors, projectors or the like." [14]

Claim 2, in a vague manner, merely refers to three factors, namely: (1) sufficiently high velocity of the particles fed into the crushing zone formed by the intersection of the path of feed and the path of

8. Plaintiffs' Brief, Pages 15 and 16.

9. The "method" claims were originally included in the application on which the apparatus Patent No. 2,155,150 issued but were subsequently divided out and made the subject matter of a separate application.

10. Plaintiffs' Exhibit No. P–26 (Schacht Patent No. 2,155,151) Page 2, Column 2, Line 36.

11. As an alternative, in Figure 6 (Sheet 1 in Schacht Patent), he shows the apparatus operating on a verticle spindle in which case a vertical entrance would be possible, although his illustration includes a chute with an inclined slope.

12. Or "striking plates" as they are termed in Schacht.

13. Plaintiffs' Exhibit No. P–26 (Schacht Patent No. 2,155,151), Page 2, Column 2, Line 37.

14. Plaintiffs' Exhibit No. P–26 (Schacht Patent No. 2,155,151), Page 4, Column 1, Line 42.

the impact members in relation to (2) the speed and (3) the spacing of the successive impact members, to carry substantially each particle of the stream fully into the path of the impact member which impacts it. As to the gravity factor, the claim has no limitations except that there be sufficiently high velocity of the particles. It says, "projecting by gravity, and along a generally defined path." There are no limitations that there be a vertical drop or an unobstructed path. There are no limitations as to the type of materials covered by the method. Schacht says, "Broadly stated my method relates to the reduction of ore, rock or other material by disintegrating it by a series of impacts."[15] All Schacht tells us is that greater efficiency is attained by direct impacting of as many of the falling particles as is possible. Plaintiffs say, "This is a simple mathematical calculation familiar to any student of elementary physics."[16] And plaintiffs' expert, Hartshorn,[17] testified in reference to distinguishing between "high" and "low" drop, "That is a high school physics calculation."[18] Nevertheless, plaintiffs' expert had to revise some of his own calculations because he had overlooked some important factors.[19]

Schacht makes no mention of the importance of size range of the material. Since in the Jeffrey-Bethlehem installation the size range of the coal being fed is maximum 1" to minimum 0", plaintiffs make a calculation for percentage of penetration, arriving at an estimate of 86%,[20] by dividing the total mass into the estimated percentages of particles in the range of 1" to ½", ½" to ¼" and ¼" to ⅛" respectively.[21]

Hartshorn in an abandoned application for patent for a similar method refers to "the radius of the average piece."[22] The term "average size particle" has also been used.[23] These calculations are predicated either upon the violent assumption that all types of material[24] which might be impacted have an equal amount of large and small particles or the assumption that every person operating a hammermill must experiment or obtain an accurate analysis and set up a formula accordingly and of course not thereafter vary the percentages in the particle sizes in the feed lest he violate the Schacht Patent. For example, if Bethlehem should change to coal having a different size range and make no other change whatsoever in any other item, including the height or slope of the chute, the speed of the machine, the diameter of the rotor, the number or spacing or length of the hammers, or anything else connected with the operation, it, nevertheless, might come within the percentage of penetration which plaintiffs contend constitutes infringement.[25] Not all materials shatter to the proper fineness with the same force of impact. If a person uses a machine for a different material and either slows or speeds the rotation of the impactors, he might come within the "method" unless he made elaborate calculations and changed the length of the chute. What Schacht

15. Plaintiffs' Exhibit No. P–26 (Schacht Patent No. 2,155,151) Page 2, Column 1, Line 74.

16. Comment on Page 11 of Plaintiffs' Brief with reference to a test made at Rochester for trial purposes.

17. Vice-President of Pennsylvania.

18. Transcript of Testimony, Page 169.

19. E.g. Testimony of Hartshorn, Transcript of Testimony, Page 220.

20. Reduced to 84.2% when width of hammers was included in the calculations. Transcript of Testimony, Page 221.

21. See Plaintiffs' Exhibit No. P–43.

22. Abandoned application of Stanley D. Hartshorn, filed January 7, 1935, Serial No. 712 (Defendants' Exhibit No. D–5).

23. E.g. Transcript of Testimony, Page 213.

24. Jeffrey Catalogue No. 368A, Page 1 (Defendants' Exhibit No. D–3) is an example of the variety of materials involved.

25. Plaintiffs' expert, Hartshorn, testified that "Possibly anything above eighty-five per cent might be considered 'substantially all'" within the meaning of the Schacht Patent (Transcript of Testimony, Page 159). Plaintiffs calculated 86% penetration for the Jeffrey-Bethlehem machines (Plaintiffs' Exhibit P–43) but including hammer width in the calculation reduced this to 84.2% (Transcript of Testimony, Page 221).

mentions in such a vague, incomplete and ambiguous manner was more ably stated by Casimir Dechamp in a patent (No. 248,-923) issued November 1, 1881,[26] for a disintegrating apparatus bearing striking similarity to Schacht's. Dechamp in 1881 spoke of introducing material through one or more openings, which material *"falling between the beaters* attached to the first plate, a, is struck forcibly by them, owing to their high velocity of rotation.[27] The material, more or less pulverized, is thrown by the centrifugal force against the walls of the casing, * * *."[28] (Emphasis supplied.)

Dechamp in 1881 then proceeded to state the method more adequately and with more variables included than does Schacht as follows:

"It will be readily understood that the disintegration may be modified, according to the nature of the material treated and the condition to which it is wished to re-duce it. To fulfill the required conditions with regard to the nature of the material, the fineness of pulverization and the quantity to be disintegrated in a definite time, changes will be necessary in the following element—viz., the diameter of the apparatus, *the height through which the material falls in the apparatus, the velocity of rotation of the beaters,* the number of the plates or series of beaters, the number of beaters for each plate, the form and length of the beaters, * * *. When the influence of each of these elements is known upon the result, it will be easy to find the *best condition* for adoption for any particular case.

"It will be understood that by this apparatus the heaviest and hardest substances and the lightest and most pliable as well can be disintegrated or pulverized. Moreover, the apparatus may be advantageously used for decortication, for grinding or milling, for granulation, or even simple

26. Defendants' Exhibit No. D–128.

27. On Page 3 of Bulletin 6015 (Plaintiffs' Exhibit No. P–34) issued by Pennsylvania, appears this statement,
    "Speeds
    "Speed is the most important of the *Controllable* Variables influencing *Impactor* reductions. More so than Beaters. Anvil Adjustment or size feed.
    "This will be clear when it is remembered that *Impact energy* varies directly as *particle mass* and the *square of the Speed*. For example, the potential energy available for reduction at 900 RPM is more than twice that at 600 RPM. §
    "Speeds range from 300 to 1200 RPM. Speeds are determined by size and *friability* of feed, and fineness desired. Relatively fine or relatively coarse reductions can be had by Speed variations.
    "This capacity to directly respond to speed variations makes for considerable *Impactor* flexibility. Particularly where wide-range reductions in a crushed product are desired, or where different materials are reduced. Variations in speed do not materially change *particle shape*. Also, of importance, fines usually do not proportionately increase with higher speeds, especially in the harder materials.
    "Methods of varying speed are usually by Variable Speed Motors, Speed Reducers, or by changing 'V'-rope Pulley ratios."

    And Schacht says,

"The control of the intensity of the impact forces is a matter of importance. For a given diameter of impeller and a given speed, the intensity with which the partly reduced material is thrown out against the reflector ring, wear plates or the secondary impeller striking plates, by the impeller is controlled by the variation of the angle between a radial line drawn through the center of the impeller and some point on the plane of the face of the impeller striking plate. The intensity may therefore be varied by merely changing the angle of the faces of the members $B^3$ opposed to the material. The intensity may also be controlled by varying the speed of the impeller and by varying the diameter of the impeller. The combination of these varying factors makes possible a control of the breaking force to suit the requirements for breaking ores or rock of different hardness or size in order to get the greatest amount of work out of a given power input." Plaintiffs' Exhibit No. P–26, Schacht Patent No. 2,155,151, Page 3, Column 1, Line 38.

Comment has already been made upon the fact that the speed of the gravital fall of the particles must also be changed in order to have the particles fall within the hammer path, i. e. the length of chute or drop must be increased or decreased accordingly.

28. Dechamp Patent No. 248,923, Defendants' Exhibit No. D–128, page 2, Column 1, Line 65.

crushing, and, finally, the most difficult thing, for reducing to an impalpable powder in place of a millstone. This disintegrator is at the same time a perfect mixer.

"It is evident that many modifications may be introduced without departing from my invention, some of which I have already indicated. The belts and guides before mentioned may be made in separate pieces and detachable. The beaters may be curved instead of straight. A closed tube may be used for conveying the material to be ground, *and any ordinary or suitable means may be used to control the rate of feed.*" [29] (Emphasis supplied.)

Plaintiffs, although elsewhere admitting that we are not concerned with secondary reduction,[30] seek to differentiate Dechamp's patent on the basis that it shows a multiple stage process with further secondary reduction. But Schacht also uses a secondary reduction by means of a rotor operating in an opposite direction to that of the primary impacting rotor. We are not concerned with the secondary reduction. The so-called "method" or mode of operation would apply to widely different apparatus in so far as their primary reduction is concerned.

Tomlinson in 1920 patented a "Rotary Impact-Pulverizer,"[31] as to which plaintiffs have a similar comment. But Tomlinson's illustration reveals a chute with vertically free falling particles directly in the hammer path for direct impact. It is true that by using the two oppositely rotating sets of hammers he is accomplishing a primary purpose of his invention, namely, the reduction of hammer wear. He accomplishes this, however, by combining the penetration by gravity and direct impact in the first stage with direct impact against the face of the hammer in the secondary stage by the combined action of "centrifugal force and the impact of the hammers." [32] Full face impact is the fundamental principle he employs in the placing of the material in the hammer path by gravity in the primary and by force in the secondary. He points out "This invention relates to improvements in the construction of rotary impact pulverizers of the type in which the material is reduced by impact with a plurality of revolving hammers," [33] and states, "The raw material is fed from the hopper 14 to the feed inlet passage 5 by means of the reciprocating feed plate 15, and is delivered through the passage 5 by gravity.",[34] and specifies that "The reduction of the large particles is accomplished entirely by impact with surfaces of the hammers rather than with sharp edges thereof, thus further reducing the wear." [35] Tomlinson further states, "abrasion due to impact of the larger pieces against the casing liners and *against the hammer ends,* is eliminated." [36] (Emphasis supplied). Although Tomlinson does not use the same terms, nevertheless, by the illustration and various statements in his patent, he is clearly invoking the same fundamental law of physics which plaintiffs say are known to every school boy and which is Schacht's "method" referred to variously by plaintiffs as "high drop", "full-face impact," and "penetration" theory.

W. K. Liggett on January 19, 1915, obtained Patent No. 1,125,137 [37] for a pulver-

29. Dechamp Patent No. 248,923 (Defendants' Exhibit No. D–128) Page 2, Column 2, Line 88.

30. Plaintiffs' Reply Brief, Page 35.

31. C. J. Tomlinson Patent No. 1,331,969 (Defendants' Exhibit No. D–128).

32. C. J. Tomlinson Patent No. 1,331,969 (Defendants' Exhibit No. D–128) Page 3, Column 1, Line 53.

33. C. J. Tomlinson Patent No. 1,331,969 (Defendants' Exhibit No. D–128), Page 1, Column 1, Line 9.

34. C. J. Tomlinson Patent No. 1,331,969 (Defendants' Exhibit No. D–128), Page 2, Column 1, Line 41.

35. C. J. Tomlinson Patent No. 1,331,969 (Defendants' Exhibit No. D–128), Page 3, Column 1, Line 29.

36. C. J. Tomlinson Patent No. 1,331,969 (Defendants' Exhibit No. D–128), Page 3, Column 1, Line 38.

37. Defendants' Exhibit No. D–30.

izer which was with some modification adopted by Jeffrey in its Type "B" swing hammer pulverizer. In Jeffrey's 1926 Catalogue No. 368A[38] there appears on Page 19 a "Sectional View of Type 'B' Pulverizer showing action of hammers." This illustration [39] shows that the process contemplates the particles penetrating the hammer path, being projected by gravity along a generally defined path (in the illustration a free vertical drop) so that the particles receive a full face impact from the impact members or hammers moving transversely through said path. It is also recognized that the speed and momentum of the hammers must vary for different materials to obtain adequate impacting.[40] And on Page 18 of the Catalogue we find the statement,

"Top Feed

"These machines are fed directly on top of the hammers; *the feeding point being much higher than is obtained for the Type*

'*A*'.[41] This is a distinct advantage, resulting not only in reducing the material very much finer but also in a great saving of power as well." [42] (Emphasis supplied.) This is an earlier recognition than Schacht's of the fundamental principle that assuming all other factors remain the same greater penetration is obtained by increasing the velocity of the falling particles thereby obtaining more full face impacting, resulting in higher efficiency.[43]

Giving a more scientific explanation of a known result is not invention,[44] but even if Schacht had done so, it was Dechamp in 1881 who did it far more intelligibly and with reference to more of the factors involved than did Schacht. Plaintiffs contend that in some of the instances efficiency would have been increased by removing a baffle plate. In other situations, as has been indicated, inserting a baffle plate might result in a greater efficiency in operation, but remov-

38. Defendants' Exhibit No. D–3.

39. A duplication of the illustration in the Liggett Patent No. 1,125,137, with some modifications not pertinent here.

40. Compare on Page 27 of Catalogue 368A (Defendants' Exhibit No. D–3) e. g., the speeds listed for various size Type "B" pulverizers when used for limestone and coal, and see also Page 25 for other materials.

41. The catalogue contains photographs of installations showing sloped and vertical chutes with high feeding point, e. g. Pages 28 and 29.

42. The language "on top of the hammers" quite evidently refers to the direction, namely, vertical fall of the material, since even a layman would understand that material falling directly on the hammer would not be reduced by impacting, chipping or forcible throwing against the breaker plate for secondary reduction.

43. Plaintiffs stress the fact that part of the opening is covered by a plate (See Catalogue 368A, Defendants' Exhibit No. D–3, Pages 26–27) but this does not obstruct that portion of the opening through which the material falls vertically into the hammer path. In a sloped chute the material piled up on this plate

would form part of the chute and would slightly reduce the velocity attained through gravity. This would only mean that a slightly greater gravity fall and resultant increase in velocity would be required. On the other hand, in a chute which had more than the required length for the required velocity it would serve to reduce the velocity. Some prior installations were shown with drops of 12 feet (e. g. the Collins & Ackman-Riley Stoker installation) and 17 feet (e. g. Champion Coated Paper Company-Riley Stoker installation, Hamilton Stipulation and Worcester depositions of Johnson and Smith, also Defendants' Exhibits Nos. D–58–81 and D–133.) This would be true in many cases where material is dumped into the chute on an upper floor level. Consequently, the term "high drop" is actually a misnomer since in such instances there might be more than maximum penetration so that some of the material would fall on the rotor shaft before it could receive a direct blow of a hammer unless the velocity were reduced.

44. DeForest Radio Co. v. General Electric Co., 283 U.S. 664, 685, 51 S.Ct. 563, 75 L.Ed. 1339; Red River Refining Co. v. Sun Oil Co. (Petroleum Derivatives, Incorporated of Maine v. Sun Oil Co.), D. C.E.D.Pa., 29 F.Supp. 636, 640, affirmed 3 Cir., 112 F.2d 575.

ing or inserting a baffle plate would not constitute invention.[45]

On November 21, 1914, C. S. Lincoln (Assignor to Allis-Chalmers Manufacturing Company) filed an application for a "portable crusher" on which patent issued February 26, 1918.[46] Lincoln conceived the idea of a portable outfit in which large material could be fed to a jaw crusher from the ground by hand, reduced to a size suitable for further pulverizing by a hammermill and have the material so prepared carried mechanically to a rotary impact pulverizer. To accomplish this he provided a bucket elevator to pick up the material leaving the jaw crusher and elevate it so that the buckets of the elevator would deliver their contents into a spout or vertical chute through which the material would then fall through a hopper (actually a continuation of the chute) into the rotary impact pulverizer. Lincoln does not expound the fundamental laws of physics involved.[47]

It is quite apparent that Lincoln had in mind the necessity of velocity in the falling particles to obtain penetration into the hammer path for impact crushing. Had he been satisfied with a "chipping" operation he would naturally have employed a simpler device such as a conveyor belt to carry the material directly from the jaw crusher to the top of the rotary impact pulverizer. The Allis-Chalmers Manufacturing Company started manufacturing this machine some time in 1915.[48] Arthur J. Jorgensen, who has been in their employ since 1912, made a tracing for a cut (Allis-Chalmers' Cut No. 10884) which followed the Lincoln patent illustration but in a sectional view.[49] In making this tracing Jorgensen included several baffles in the hopper portion of the chute, but the actual drawing of the hopper made November 17, 1914,[50] with the corrections thereon, leave no doubt that the upper baffle was removed from the design on April 1, 1915, and the lower baffle likewise on April 7, 1915.[51] The machines as manufactured and sold by Allis-Chalmers did not contain any baffles.[52] Consequently, there was a direct vertical drop of the material until it reached the feed liner in the entrance to the pulverizer. This feed liner, which formed a continuation of the tube and hopper, was sloped,[53] but this would not alter the fact that there was a projecting by gravity along a generally defined path of a stream of particles to be crushed, with impact members moving transversely through said path. The importance of direct impact (which of course requires penetration into the hammer path) is stressed in Allis-Chalmers Bulletin No. 1467.[54] The Bulletin states, inter alia,

45. Pyrene Mfg. Co. v. Urquhart et al., 3 Cir., 175 F.2d 408, certiorari denied 338 U.S. 826, 70 S.Ct. 73.

46. Lincoln Patent No. 1,257,619, Defendants' Exhibit No. D-128.

47. Plaintiffs' testimony is that they are known to every school boy.

48. Deposition of Arthur J. Jorgensen, Page 8.

49. This cut was used unchanged for some time thereafter. It appears in Allis-Chalmers Bulletin No. 1467 (Copyrighted 1928) Page 12, and in an earlier uncopyrighted Bulletin No. 1452, Page 17 (Defendants' Exhibits Nos. D-103 and D-102).

50. Defendants' Exhibit No. D-105, Drawing No. 10727 (Allis-Chalmers L.B.H. Hummer Pulverator Hopper and Spout).

51. See explanation of this drawing in testimony of Jorgensen (Deposition of Arthur J. Jorgensen, supra).

52. This is not only the testimony of Jorgensen, but is verified by the testimony of Joseph N. Hanley, a Wisconsin farmer, who in 1924 purchased one of these machines. (Deposition of Joseph N. Hanley, Page 5.)

53. The slope would cause some reduction in velocity (Jorgensen Deposition, supra, Page 23). The hopper with baffle plate employed on some of Allis-Chalmer's pulverizers was not used on this machine. (cf. Cut 22603, Page 3, and Cut 11050, Page 11 of Bulletin No. 1467, supra, and Drawing No. 10727, Defendants' Exhibit No. D-105). However, the explanation for the inclined plate (Page 3 of Bulletin No. 1467) would apply equally to the slope, namely, even distribution and uniform feeding to the interior of the mill.

54. Defendants' Exhibit No. D-103. Similar statements appear in an earlier bulletin, No. 1452 of unknown date, on Pages 2 and 3 (Defendants' Exhibit No. D-102).

(Page 3) "The rapidly revolving hammers * * * strike the material a succession of heavy blows, shattering it and throwing it violently against the first involute breaker plate * * *.", and on Page 4, "a glancing blow is not effective" and "This same principle is used in breaking the material, namely by striking it squarely the full force of the blow." We have here a utilization of the fundamental principle of velocity obtained through gravity in the primary crushing and through the force imparted by the hammers for the secondary.[55] The Lincoln apparatus and its adoption and use by Allis-Chalmers Manufacturing Company clearly invoked and applied the principles of "penetration" and "direct impact" long prior to Schacht.

In 1920 the Vermarco Lime Company had in operation a Brainard Pulverizer,[56] which received comment in the May 8, 1920, issue of "Rock Products."[57]

Defendants' calculations[58] based upon the known facts,[59] including size of material,[60] correctly shows that the penetration was closer to maximum[61] with more particles receiving a direct impact with each hammer blow and consequently a closer approach to maximum efficiency than plaintiffs' own "Rochester Test" of "high drop" made for the purposes of trial.[62]

■ Schacht's claims here involved are entirely too vague, ambiguous, indefinite and incomplete, and require independent experimentation to ascertain the bounds thereof. Consequently, they would not in any event be in compliance with the Patent Statutes.[63]

### The Battey Patent

Pennsylvania alleges that Jeffrey is infringing claims 4, 6, 9, and 10 of Patent No. 2,149,571 issued March 7, 1939, and for which application was filed October 30, 1936, by W. A. Battey, Vice-President of Pennsylvania, and assigned to Pennsylvania. We are not concerned with special features of the patent, such as the adjustable screen cage or the particular type of breaker plates. The Jeffrey-Bethlehem machine is a symmetrical, reversible im-

55. Hartshorn, Pennsylvania's Vice-President and expert witness, recognized that gravity was not the only means of obtaining velocity. (See illustrations in Hartshorn's abandoned application for patent (Defendants' Exhibit No. D-5) and so did Schacht (Schacht's Patent, supra, Page 4, Column 1, Line 42).

56. Constructed under Brainard Patent No. 1,144,102, Defendants' Exhibit No. D-57. See scale drawing agreed upon by the parties, Defendants' Exhibit No. D-55. cf. also Defendants' Exhibit No. D-56 and Madison Stipulation-Deposition, Pages 1-3.

57. Defendants' Exhibit No. D-53.

58. Defendants' Brief, Pages 87-89.

59. An enlargement of a photograph in "Rock Products" (Defendants' Exhibit No. D-54) shows the Brainard Pulverizer with a hopper on top. A long chute enters the hopper with a feed slide (shown on the photograph) between the chute and the hopper, which was adjusted by a workman (Montgomery Deposition). "Rock Products" shows size of material was 3/4" to 0.

60. As has been pointed out, Schacht makes no reference to the important factor of size of material or how to arrive at any

basis for calculation in material ranging in size from a maximum to a minimum.

61. Considering size of hammers, size of particles, etc.

62. See Defendants' comparative summary which correctly lists the ratios (Defendants' Brief, Page 90). However, even ratio can be misleading since e. g. a hammer length of 3" (a hammer path 3" in depth) with a falling particle velocity of 3" between hammer blows would permit three particles of average size in vertical line to fall into the hammer path for direct impact if average size is 1" and only one particle of average size of 3", but an average size of 1" predicated upon maximum 2" to minimum 0" would permit the maximum size to receive direct impact, whereas an average size of 3" predicated upon $\frac{6'' \text{ max.} + 0'' \text{ min.}}{2}$ or 3" would never permit the 6" maximum size to receive a full face direct impact. Hammer length is therefore another important factor not mentioned by Schacht.

63. Standard Oil Co. of California v. Tide Water Associated Oil Co., 3 Cir., 154 F. 2d 579, 582-583; Schriber-Schroth Co. v. Cleveland Trust Co. et al., 305 U.S. 47, 59 S.Ct. 8, 83 L.Ed. 34.

pact type hammermill having the breaker plates and grate bars duplicated symmetrically on both sides of a reversible rotor [64] with swing type hammers, with the material fed vertically at top center into the hammer path.[65] It is the vertical center feed with reversibility of the rotor that is here involved. In the Battey Patent proceedings the Examiner pointed out that mere reversibility is not patentable.[66] The main obstacle to Battey's application was the Crites Patent [67] for a reversible hammermill of the impact type with swing hammers [68] which was symmetrical except that it was necessary to move an adjustable liner to the opposite side of the machine in order to change the position of the tramp iron pocket [69] in accordance with the direction of operation. This is identical with the requirement in Battey's machine that the positions of the closed breaker plate and open opposite plate be reversed.

The various statements in Crites' application leave no doubt as to what was intended. He says:

" * * * the beaters can be revolved in either direction as may be desired.

    \*     \*     \*     \*     \*     \*

" * * * Moreover, in the use of such mills as that shown in the drawing, the swing hammers become worn in use more rapidly at one point than at another so that it becomes advisable to turn the hammers so as to bring a different face in advance. As will be readily understood, these difficulties are taken care of fully and completely by the provision of the reversible form of mill." [70]

and again

"When the hammers 38 become worn on one face so as to make it desirable that the direction of rotation of the mill be changed, or when for any other reason it is desired to change the direction of rotation, the position of the liner 49 can very quickly be shifted, and the mill can be driven in the opposite direction without further change by merely reversing the direction of rotation of the motor 18." [71]

The reversing of a hammermill for the purpose of wearing down the hammer face on each side or re-contouring it until it had been worn down to a size no longer serviceable, was clearly taught by this patent. Nor was this a new and startling discovery by Crites. It had been the practice prior thereto to equip machines with symmetrical hammers which were reversible and could be worn down equally on both sides.[72]

To avoid Crites, Battey claimed "re-sharpening" as a new, unexpected and valuable result,[73] which he contended could not be obtained in a machine with an axial feed (as Crites') but would occur in one like Battey's with a radial feed. This "re-sharpening", however, is definitely not the re-contouring [74] already discussed and

64. Mounted for rotation on a horizontal axis.

65. Stipulation, Plaintiffs' Exhibit No. P–28.

66. Defendants' Exhibit No. D–139, Battey Application File Wrapper, Page 39, see also Page 38.

67. Defendants' Exhibit No. D–128, Patent No. 1,560,766 issued to Joe Crites, November 10, 1925, on application filed March 8, 1924.

68. Defendants' Exhibit No. D–128, Crites Patent No. 1,560,766, Page 1, Column 1, Line 8.

69. Defendants' Exhibit No. D–128, Crites Patent No. 1,560,766, Page 2, Column 1, Line 44; see also Page 3, Column 2, Line 66.

70. Defendants' Exhibit No. D–128, Crites Patent No. 1,560,766, Page 1, Column 1, Line 21 and Line 31.

71. Defendants' Exhibit No. D–128, Crites Patent No. 1,560,766, Page 3, Column 2, Line 106.

72. See e. g. Defendants' Exhibit No. D–3, Jeffrey's Catalogue No. 368A, Pages 6 and 19, and installations of this type, e. g. Lehigh Portland-Birmingham installation in 1923 of Jeffrey Type "B" 42" x 48" pulverizer (Defendants' Exhibits Nos. D–47 and D–52).

73. Defendants' Exhibit No. D–139, Battey Application File Wrapper, Pages 32, 34, 45, 48, and 56 (directly on Crites).

74. Defendants' Exhibit No. D–12.

which would occur in either type. It is not the wearing down equally from both sides but as Battey himself describes it

"* * * said hammers being symmetrically constructed with edges and striking faces at each side thereof, whereby material is struck by the *near edges* and faces of said hammers, and the *further edges* of said hammers are simultaneously sharpened by the impacting of the material along the outer edges of said hammers * * *."[75] (Emphasis supplied).

This is likewise indicated in the specifications.[76] Battey repeatedly indicated that he was claiming "the clearly new and unexpected result of automatic resharpening"[77] as something no prior reference suggested.[78]

█ Pennsylvania's expert witness admits resharpening of the trailing edge occurs only if the corner has been worn "just a little" but not if the first corner has been severely worn; if the hammer metal is manganese steel, but not with a heat-treated, forged steel hammer; and if the material being impacted is a hard substance such as limestone, but not with coal.[79] The claims 4, 6, 9, and 10 are therefore entirely too broad and indefinite, containing no such limitations. The Jeffrey-Bethlehem machine is used for impacting coal and does not use manganese hammers.[80] As far as re-contouring is concerned, this was fully covered by Crites. Appropriate here is the statement of Judge

Kalodner in West Branch Novelty Co. v. Bloom, D.C.E.D.Pa., 31 F.Supp. 673, 682:

"I am quite aware that the grant of a patent by the Patent Office carries a presumption of validity: Mumm v. Jacob E. Decker & Sons, 301 U.S. 168, 57 S.Ct. 675, 81 L.Ed. 983. But I need hardly say that the presumption is not conclusive—that much is evidenced by the innumerable court decisions declaring patents invalid. The fact that many of the prior patents, or all the relevant ones, were cited before the Patent Examiner, may strengthen the presumption, but does not supply want of conclusiveness."

There are, however, in the present instance additional facts which were not before the Patent Office.

In 1909 Jeffrey designed and made a symmetrical reversible hammermill [81] with duplicate breaker plates [82] on the opposite sides of the rotor, fully symmetrical and requiring no change of position for the reversal of the rotor.[83] It was equipped with swing hammers having identical opposite faces for impacting in either direction without any changing of the hammers which were supplied in various materials, including manganese steel, according to the customer's requirements.[84] The machine was designed to operate in either direction.[85] The top center feed opening was too large and permitted some of the material to be thrown back. To prevent this is a liner was bolted to the hopper on

75. Defendants' Exhibit No. D–139, Page 15 (Original, disallowed claim 8), see also Page 32. Any such effect, however, would occur equally by reversing hammer direction, either by reversing the hammers or the rotor. If we take Battey's full statement with the additional words "during the secondary crushing operation, so that said hammers are self-sharpening when said rotating system is driven alternately in opposite directions," it would apply to Crites as well.

76. Plaintiffs' Exhibit No. P–24, Page 3, Column 1, Line 8.

77. Defendants' Exhibit No. D–139, Battey Application File Wrapper, Page 48.

78. Defendants' Exhibit No. D–139, Battey Application File Wrapper, Page 43.

79. Deposition of Stanley D. Hartshorn, Hearing held at Philadelphia, Pa., February 13, and 14, 1948, Pages 87–89.

80. Plaintiffs' Exhibit No. P–28, Stipulation, Pages 1–2, and Exhibit Drawing C–220412.

81. Deposition of Walter J. Armstrong at Washington, D. C., on February 27, 1948, Pages 6–20, and Defendants' Exhibits Nos. D–13 to D–23.

82. Deposition of Walter J. Armstrong, supra, Page 16, and Defendants' Exhibit No. D–20.

83. Deposition of Walter J. Armstrong, supra, Page 16, and Defendants' Exhibit No. D–20.

84. Deposition of Walter J. Armstrong, supra, Pages 19–22.

85. Deposition of Walter J. Armstrong, supra, Page 19.

top of the machine and covered part of the opening. This liner served as an additional breaker plate. To reverse the machine it was desirable to reverse this plate for efficient operation. Battey's machine, however, also requires the breaker plate on one side to be lowered and the opposite breaker plate raised before reversing the direction of the rotor. As far as the size of the opening requiring some sort of restriction is concerned, the same is true of Battey's machine.[86] A number of Jeffrey's 1909 16″ x 12″ machines were sold and some are still in use and have been operated in both directions.[87] Neither would restricting this center opening at exact center require anything more than mechanical skill.

In 1915 Jeffrey manufactured and sold a fully symmetrical reversible swing hammer type corn cob hammermill[88] with a restricted center top feed opening. It differs in having a duplicate set of breaker bars on each side instead of breaker plates, as more suitable for the particular type of material. No high degree of mechanical skill is required to substitute the 1915 machine type of center feed opening in the 1909 machine or to substitute the 1909 or the later type breaker plates in the 1915 machine for use on more frangible materials. Actually, whether the material enters at exact center or one-half of center would appear to have no bearing upon the results of reversal, in so far as hammer wear is concerned, and involves no novelty.

In 1913 or 1914 another Jeffrey machine known as 36″ x 24″ Type "D" Pulverizer, with breaker plates on one side only, was successfully operated in both directions in a limestone crushing operation for the identical purpose of compensating for hammer wear, and was demonstrated as accomplishing this result.[89] It does not appear whether this machine had manganese steel hammers but, as already indicated, such hammers were furnished where required as early as 1909.

Subsequently, Jeffrey manufactured a 42″ x 48″ Type "B" Pulverizer[90] and sold same as early as 1923.[91] It had breaker plates on one side only, but by the addition of duplicate breaker plates on both sides it would have been a fully symmetrical, reversible center top feed, swing hammer pulverizer without any other change whatsoever in the rotor (including hammer), breaker plate or grate bar structure. It would require no changes such as in Battey's machine in connection with reversing. This machine had reversible hammers to accomplish the intended purpose of compensating for hammer wear. Jeffrey's Bethlehem machine is the Jeffrey 1923 42″ x 48″ Type "B" Pulverizer with such duplicate breaker plates and no other material changes or variations which would have any significance here. It required very little skill and certainly no novelty or invention to make this change. It became merely a modernized version of the 1909 machine.[92] Operating on coal without manganese hammers it certainly produces no results which were not fully known and taught by the prior art, nor would the addition of manganese hammers be anything new or novel. Battey merely called attention to an additional factor, resharpening, but did not limit the same to the particular conditions under which this might occur, nor discuss any difference in the frequency of reversal of the ham-

86. Transcript of Testimony, Pages 244–245.

87. E. g. Machine sold to J. W. Long in 1910 (Defendants' Exhibit No. D–26) Stipulation entered at Bristol, Va., the Bristol, Va., deposition of S. D. Hughes and the deposition of Walter J. Armstrong, supra, Pages 30–41. For other machines sold see the Stipulation entered into at Birmingham, Ala., covering sales to M. R. Grinnell and American Clay Co.

88. Defendants' Exhibits Nos. D–95, D–122, D–130, and D–131.

89. Deposition of Walter J. Armstrong, supra, Pages 60–61.

90. Defendants' Exhibit No. D–3, Jeffrey's 1926 Catalogue No. 368A, Page 27.

91. Lehigh Portland Cement Co., Birmingham, Ala., installation, Defendants' Exhibits Nos. D–47 and D–120.

92. Galion Iron Works & Mfg. Co. v. Beckwith Machinery Co., 3 Cir., 105 F.2d 941, 942.

mers from that which was well known in the prior art.[93] Moreover, Battey concedes that such resharpening would occur in the secondary crushing stage involving the grate bars.[94] This would be true in Crites' axial feed machine. At best, Battey merely calls attention to *additional* resharpening occurring (under the special conditions required) when the hammer ends strike the material entering the machine in a radial feed. Even were we to assume that this constituted invention, the claims do not have the requisite sufficiency of precision in description.[95] But it is fundamental that claiming a new result in the use of an old device is not patentable,[96] nor is it invention to perceive that something discovered by others had qualities that they may have failed to detect,[97] and similarly "the new use of an old machine or method does not constitute patentable novelty. The application of an old method or apparatus to a similar or analogous subject will not sustain a patent, even if the new form of result has never before been contemplated." [98]

## Conclusions of Law

1. Defendants do not infringe claim 2 of Schacht Patent No. 2,155,151.

2. Claim 2 of Schacht Patent No. 2,155,151 is invalid in view of the prior art.

3. Claim 2 of Schacht Patent No. 2,155,151 is invalid because it is too vague, ambiguous, indefinite, and incomplete, and does not contain sufficient description or disclosure.

4. Defendants do not infringe claims 4, 6, 9, and 10 of Battey Patent No. 2,149,571.

5. Claims 4, 6, 9, and 10 of Battey Patent No. 2,149,571 are invalid in view of the prior art.

6. Claims 4, 6, 9, and 10 of Battey Patent No. 2,149,571 are invalid because of indefiniteness and insufficiency in description and disclosure.

7. Defendants are entitled to judgment with costs, together with reasonable attorneys' fees.

Let appropriate decree be drawn and presented in accordance herewith.

---

93. Actually it was merely calling attention to an additional advantage which would result from a certain frequency of reversal of a machine such as Jeffrey's 1909 type, under certain specific conditions, without the introduction of any new or novel factor.

94. See Note 75, supra.

95. Standard Oil Co. of California v. Tide Water Associated Oil Co., 3 Cir., 154 F. 2d 579, 582 and 583.

96. Warden v. City of St. Louis, Mo., 8 Cir., 140 F.2d 615, 617; Application of Benner et al., 174 F.2d 938, 942, 943, 36 C.C.P.A., Patents, 1081; Mathews Conveyor Co. v. Palmer-Bee Co., 6 Cir., 135 F.2d 73, 88; In re Thuau, 135 F.2d 344, 347, 30 C.C.P.A., Patents, 979; White et al. v. E. L. Bruce Co., D.C.Del., 66 F.Supp. 652, 657.

97. Vapor Blast Mfg. Co. et al. v. Pangborn Corp., D.C.Md., 93 F.Supp. 792, 797.

98. White et al. v. E. L. Bruce Co., D.C. Del., 66 F.Supp. 652, 657.